**DEERING, MILLIKEN & CO., Inc.,**
**Plaintiff-Appellee,**

v.

**TEMP–RESISTO CORPORATION and**
**Samuel Kaplan & Sons, Inc.,**
**Defendants-Appellants,**
**and**
**Acker & Jablow, Inc., Charles W. Carvin**
**Co., Inc., and N. Erlanger Blumgart &**
**Co., Inc., Additional Defendants on**
**Counterclaims-Appellees.**

**Nos. 195 and 196, Dockets 25200 and 25201.**

United States Court of Appeals
Second Circuit.

Argued March 10, 1959.

Decided Jan. 22, 1960.

See also 169 F.Supp. 453.

Charles M. Thomas, Washington, D. C., and Stuart N. Updike, New York City (Sidney W. Russell, Washington, D. C., Townley, Updike, Carter & Rodgers, William P. Hindman, Jr., New York City, on the brief), for plaintiff-appellee.

Mortimer Hays and Simon H. Rifkind, New York City (Hays, Podell, Algase, Crum & Feuer, Benjamin Algase, Mortimer Feuer, Martin Mensch, Morgan, Finnegan, Durham & Pine, Edward N. Costikyan, Granville M. Pine, New York City, on the brief), for defendants-appellants.

Ben Herzberg, New York City (Hays, Sklar & Herzberg, Charles Feit, Joseph S. Hellman, New York City, on the brief for appellees Charles W. Carvin Co., Inc.,

and N. Erlanger Blumgart & Co., Inc., and Frederick E. M. Ballon, New York City, on the brief for appellee Acker & Jablow, Inc.).

Before WASHINGTON, WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Defendants Temp-Resisto Corporation and Samuel Kaplan & Sons, Inc. (appellants) appeal from a judgment in favor of Deering, Milliken & Co. Inc. (appellee) sustaining the validity of Patents Nos. 2,630,620 and 2,630.573, issued March 10, 1953. The product involved is a fabric coated with metallic material and known as "Milium," produced by plaintiff under an agreement with the patentee, H. J. Rand. Defendants' product, "Temp-Resisto," was found to have infringed. The district court enjoined its further manufacture during the term of the patents and awarded damages, the determination of which was referred to a Special Master. The court dismissed counterclaims, interposed against plaintiff and the additional defendants, which alleged violations of the Sherman Act, 15 U.S.C.A. §§ 1, 2, the Robinson-Patman Act, 15 U.S.C.A. § 13, and unfair competition.

The action was tried before a Special Master, whose findings, recommendations and additional findings on recommittal were approved and adopted by the district court. Defendants challenge all the material findings, complain about the exclusion of certain evidence offered on recommittal and assert affirmatively the defense of patent misuse. Although appellants argue non-infringement at length, this issue is secondary to their contention that the Rand patent [1] is invalid because: (1) it is neither new nor an invention; (2) it covers only the products of prior art; (3) the Rand "invention" consists merely in describing the prior art in greater detail; and (4) the "invention" is void for lack of utility. If there be any merit to the invalidity arguments, infringement becomes academic. Thus initially an analysis must be made of the patent and its claims as to inventiveness and their relationship to the prior art.

The patent provides that its fundamental object is "to provide a textile fabric bearing a thin superficial application of heat reflective metallic material" which would retain its "porosity, hand [2] and cleaning properties * * * unimpaired * * *."

Claim 1 [3] contains the basic elements of Rand's "invention." Virtually any cloth, any metal or any binder could be used. The patent contained drawings as

---

1. Patents Nos. 2,630,620 and 2,630,573 are collectively referred to as the Rand patent.

2. "Hand" is defined in textiles as the texture or feel of a fabric, especially of silk. Webster's New International Dictionary (2nd Edition, 1954).

3. "1. A pliable, porous and heat reflective fabric comprising a preformed textile weave of fibrous warp and weft threads, a discontinous film composed of a multiplicity of heat reflective metallic flakes applied to one side of the fabric, a binder between the heat reflective metallic flakes and the threads to adhere said flakes to the threads, the opposite side of the fabric being substantially free of said metallic flakes and binder, said fabric being permeable to moisture, the film of metallic flakes being adhered to the outermost fibers of each of the individual threads of said fabric without substantial penetration into the body of said threads, whereby a multitude of air pockets is formed between said film of metallic flakes and said threads, said air pockets being substantially free of said metallic flakes, the warp and weft threads at the intersections thereof providing interstices in the fabric, said interstices and the surfaces of the fibrous warp and weft threads at said points of intersection being substantially free from said metallic flakes, the outer exposed surfaces of the threads of the fabric on the coated side being substantially completely covered by the discontinuous heat reflective metallic film, the metallic film enveloping the upper exposed surfaces of each warp and weft thread but being discontinuous adjacent the areas of intersection of the warp and weft threads, whereby the fabric is porous, pliable and reflective to radiated heat."

to how the threads would appear under microscopic examination after being coated and a sketch of a proposed spraying apparatus for the application of the flake and binder. The method of application involved "the balance of a number of variables including composition of the metallic application, distance of spray heads from the fabric * * *" which was stated to be "readily attained by those skilled in the art." [4]

Breaking this claim down into its essential elements the fabric was to be "pliable, porous and heat reflective" and comprised of "a preformed textile weave of fibrous warp and weft threads." This result was to be obtained by applying a discontinuous film of heat reflective metallic flakes to one side of the fabric. A binder between the flakes and the fabric threads was to cause them to adhere to the threads without substantial penetration into the threads. The exposed side of the fabric was to be substantially completely covered but the unexposed areas, namely, at the points of intersection, would be substantially free of the flakes. This, in substance, Rand claimed would make the fabric "porous, pliable and reflective to radiated heat."

Rand had come to appellee's attention in 1949 and had worked with appellee. A commercial operation to produce the fabric was commenced in early 1950 and in March appellee with a fanfare of publicity announced this allegedly new fabric subsequently named "Milium." On August 28, 1950 Rand filed his original application (Serial No. 181,756). The application on which the Rand patent issued was a continuation of the original application and was filed September 29, 1952 (Serial No. 311,961).

The original claims disclosed a "pliable porous fabric having a metallic application adhered superficially to one side thereof, said metallic application being composed of discrete particles of metal" which was "radiation reflective." These claims were rejected by the Patent Office "as being unpatentable over Juel, Wiggin, Cavanaugh, Allan et al. or Humes, each of which discloses a fabric coated with a binder and metal particles." "The claimed proportions of binder and metal flakes [were] not considered to be critical." Further amendments were submitted. The Patent Office continued to reject stating that "Claims 1, 2, 3 and 8–18 are rejected as being unpatentable over Cavanaugh who discloses a fabric lightly sprayed with bronze powder, and a binder in order to preserve the original pliability of the fabric. Cavanaugh specifically takes precaution to prevent more than a superficial penetration of the coating into the fabric. If it is true that applicant's coated fabric is air and moisture permeable and has air pockets therein, the same must also be true of the lightly coated fabric in Cavanaugh. * * * The claimed coated fabric is not considered to be patentably distinguishing over the coated fabric of Cavanaugh since whatever differences may be present are considered at the most unpatentable variations, and well within the skill of the art." Finally a few adverbs were included in the claims and on March 10, 1953 the Rand patent issued although as the Special Master found the subject matter was sufficiently disclosed in the original application and that the amendments "made no material addition to or variance from the original disclosure." Thus twice the Patent Office had rejected the Rand coated fabric as unpatentable and as "well within the skill of the art." Inquiry, therefore, must be made to ascertain what Rand claims to have invented and whether the "invention" is entitled to receive the monopolistic protection of the patent laws.

First the elements should be eliminated as to which no claim is made. Rand did not invent the base fabric—virtually any fabric could be treated. He did not invent the metallic flakes or the binder.

---

4. Both Milium and Temp-Resisto employ nitro-cellulose, not called for in the patents, as the binder with which the metal flakes are affixed to the fabric. The district court, however, did not consider these discrepancies important.

Several different types of binder are suggested. Rand could not have invented the qualities with which the various elements were endowed by natural law, such as, heat reflectivity of metallic flakes, porosity of textile fibers, the interstices of woven cloth or permeability of textiles to moisture and air. Nor does he claim to have invented any machine by which to apply the coating although he does furnish a diagram of a spraying[5] operation. The means to accomplish the spraying of a light coating and the degree of viscosity required for the best results were to be solved by those skilled in the art. Again natural laws, not inventiveness, teach that a spray applied to one side of a fabric will coat the side of the threads exposed to the spray and the under side protected by the exposed portion will not be coated. If this obvious result permits the fabric to remain pliable and porous it is due to the qualities of the fabric; not to Rand. Thus there is left, in effect, only the idea that a fabric to which a light and superficial coating has been applied would have certain heat reflecting or heat retaining characteristics. However, if Rand originated the idea of coating a fabric with metallic flakes to achieve the properties asserted for "Milium" he may well have made a substantial contribution worthy of patent protection.[6] But it must have been his idea and not suggested by others whether by prior publication or prior art.[7]

*Kirkpatrick*

In May 1943 a Professor of Sociology, Dr. Clifford Kirkpatrick, published the results attained through his experiments with fabric coating for the purpose of insulation. Dr. Kirkpatrick, a person unskilled in textiles as well as the general subject of thermodynamics, sprayed some cotton sheeting with aluminum paint and found an increase in reflectivity. He evinced an awareness of the need for flexibility, porosity and light weight, and noted that these had been accomplished in the cotton sheeting by means of a thin spraying. Dr. Kirkpatrick envisaged use of fabrics subjected to his process in a variety of articles including linings for overcoats, although he made no attempt at commercial exploitation. His report was entitled "Warmth Without Weight."

---

5. Actually both Milium and Temp-Resisto were commercially manufactured by the knife-coating method.

6. The thermodynamic principles basic to the benefits to be derived from metallic coated fabrics, as developed upon the trial, are essentially these: Although there are three modes whereby heat is transferred from a body of higher temperature than its surroundings, radiation is the one most important when considering heat loss through clothing. The degree to which a body radiates heat depends on its surface, i. e., a dull black surface has a high emissivity, a bright reflective surface has a low emissivity. Thus reflectivity and emissivity are commensurable by an inverse ratio. When a fabric coated with a reflective metallic deposit is used as a garment lining—the coated side facing away from the body, the combined effect of the lowered emissivity and the air space between the metal surface and the outer cloth is that of a radiant heat barrier. Some of the heat emanating from within is therefore prevented from reaching the outer cloth with the result that the wearer is warmer.

(Originally the patentee, Rand, did not proceed on this theory. The claims disclose the notion that a reflective liner will radiate heat back to the source. As the testimony before the Master unfolded, it became apparent that although this idea was fallacious, the process would nevertheless be successful in the sense of heat retention so long as an air space were provided adjacent to the metal surface.) Reducing these principles to a commercially feasible product entails coating the fabric superficially so that its apertures and portions of its threads are not covered with metal. By this interstitial application the cloth retains its flexibility, permeability to air and moisture, light weight, and ability to be cleaned in the usual fashion.

7. "A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains * * *" 35 U.S.C.A. § 103.

The features of the Kirkpatrick publication were that "The spraying of light fabric even only on one side with aluminum paint permits the reduction of body heat loss from 20% to 40%"; that there was no difficulty with the compatibility of reflectivity with the degree of porosity of fabric necessary for the evaporation of moisture from the skin (Kirkpatrick had actually sprayed cotton sheeting with a thin film of aluminum paint which permitted light and air to pass through the fabric); that "A fabric to which a reflective surface is applied may be sufficiently porous to permit the necessary air circulation and evaporation of perspiration and yet have marked insulation value"; and that "A fabric with one side more reflective than the other is a better insulator with the brighter surface outside away from the heat radiating body * * * ."

The modest professor "realized that the experiments here reported were exceedingly crude and * * * [omitted] * * * many details since this article is intended to be suggestive rather than conclusive." Nevertheless the idea was disclosed leaving only to those skilled in the art its adaptation to particular fabrics with various chemical binders. A bibliography of nineteen works on the subject was appended to the report.

■ In addition to cotton sheeting Kirkpatrick, in 1943, had sprayed cot and tent fabrics. The professor from his experiments had even concluded that the reflective surface should for better results be worn away from the heat radiating body—a fact which the parties here apparently discovered by their own subsequent experimentation. Rand and an associate were fully aware of Kirkpatrick's publications, had studied them and been in communication with him. See Zephyr American Corp. v. Bates Mfg. Co., 3 Cir., 1942, 128 F.2d 380, 385.

The Kirkpatrick work was not considered by the Patent Office, a fact which may be taken into account when assessing the presumption of validity attached to the issued patent. See Note, 57 Mich.L.Rev. 426 (1959).

### The Cavanaugh Patent

In October 1924 Cavanaugh obtained a patent for treating fabrics with metallic or bronze powders in an appropriate binder which would "at the same time [preserve] the original softness or pliability of the fabric, unimpaired by such treatment." To avoid more than superficial penetration of the fabric by the coating material, Cavanaugh provided for a moistening medium which would thus "exclude at least partially the penetration of the finishing material into the interior fibres." Cellulose or casein binders and several kinds of metallic powders were suggested. Both thin spraying and knife scraping methods of application were mentioned.

### The Canadian-Fourt Reports

Around 1943 there was also considerable effort expended in military research on the subject of reflecting cloth. Two scientific reports[8] on this work indicate that the idea of trying metal-bearing fabrics in clothing was well established. Tests were completed which demonstrated the varying reflectivities achievable by different methods, one reaching with aluminum flakes a reflectivity of 75%.[9] Both the spray and knife-coating processes were investigated; the latter was found to be preferable. The importance of maintaining an air space against the metal surface was emphasized; mesh spacers placed between the metal and the outer cloth were used to furnish a uniform air space of one-half to one inch, the point at which the barrier to transfer by radiation attains its greatest efficacy (beyond this distance convection currents become significant). It was re-

---

8. One, dated September 20, 1943, by Lyman Fourt, was submitted to the National Research Council; the other, dated April 2, 1943, was compiled under the auspices of the Canadian Associate Committee on Aviation Medical Research.

9. Although the Master tested only Temp-Resisto in this regard, it appears to be conceded that both products have a reflectivity of between 30% and 35%. Measurements taken from ordinary fabrics showed a reflectivity of about 8%.

ported that along with a substantial air space there would also have to be a reflectivity of at least 60% in order to effect any noticeable increase in warmth. To sustain this percentage it was necessary to thoroughly coat the fabric, with the concomitant result of stiffness and impermeability. Recognizing the need, even in military garments, for flexibility and porosity, the researchers concluded it was impracticable to produce the type of metal-lined garment that provided improved insulation.

### The I. G. Farben Application

A German patent application filed in 1942 by I. G. Farben claims a process "for decreasing the heat radiation of fabrics by applying to the fabrics metal and, as a binding agent for the metal, solutions or dispersions of natural resins or synthetic polymerization or condensation resins and calendering if desired."

### Production of Reflective Fabrics

Commercially successful products in a related field had been developed from the principle of reflecting cloth. Gordon-Lacey Chemical Products Company in 1949 began to manufacture cloth for use as ironing board covers. This was a cotton fabric, superficially coated with aluminum flakes which retained its porosity and pliability although it was somewhat more stiff than a typical garment lining. Reflective ironing board covers have been enthusiastically received by the public and their manufacture now appears to be on widely competitive basis.[10]

From this summary of the prior art it is plain that the theory underlying the Rand patent had been abroad for a number of years. The ingredient thermal principles had been related to clothing, the processes for this result including the proper binder had been devised, and the requisite permeability and hand as achieved by a light coating had been acknowledged. Pointing to the distinction between process and product patents, appellee nevertheless asserts that its finished product has not been anticipated. The argument runs that none of Rand's predecessors had specifically originated a flexible, washable, porous, reflective fabric suitable for lining an overcoat and capable of being dry-cleaned. It is true that Dr. Kirkpatrick made no tests as to the "dry-cleanability" of his cotton sheeting, but the concept of patent anticipation does not demand precursive data on every experimental possibility. It would be rather singular for a sociologist, far removed from the textile marketplace, to have made such a test. On the other hand, to a textile craftsman, aware of the prior art, the test would be routine as would tests to determine a desirable viscosity of the metallic film in order to render the product most acceptable to the public. That the precedent research failed to include detailed findings oriented to the world of fashion can be of no significance unless the standard of 35 U.S.C.A. § 103 is to be changed from what *would have been obvious* to what *in fact has already been done.*[11]

10. See Glatt v. G. C. Murphy Company, D.C.D.Md., 1958, 168 F.Supp. 50, affirmed 4 Cir., 1959, 270 F.2d 137. The activities of Mr. Glatt are also noteworthy in establishing rather conclusively that the Rand invention would have been obvious to those possessing ordinary skill in the art. From Judge Watkin's findings it appears that Glatt in 1949 had thought of using his ironing board fabric as a garment liner (among other uses) by reducing the amount of aluminum flakes applied to the cloth.

11. It is unnecessary to engage in the discussion of the not fully resolved (see Zoomar, Inc. v. Paillard Products, Inc., 2 Cir., 1948, 258 F.2d 527, certiorari denied 358 U.S. 908, 79 S.Ct. 237, 3 L.Ed.2d 230; E. J. Brooks Co. v. Stoffel Seals Corp., 2 Cir., 1959, 266 F.2d 841, certiorari denied 1959, 80 S.Ct. 154) question concerning the current test of invention. Regardless of whether the 1952 Amendment, 35 U.S.C.A. § 103, as interpreted by Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, certiorari denied 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799, relaxed the "flash of creative genius" requirement of Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 41, 86 L.Ed. 58 and returned without qualification to the doctrine of Hotchkiss v. Greenwood, 1851,

Appellee points out that the aluminum flakes in Milium are "discontinuous" and that the interstices are not clogged, hence the cloth retains its hand. But the prior art explicitly instructed Rand about the necessity of permeability and pliability, and taught him to accomplish these by a light covering of metal. Rand's primary contribution was merely to describe in microscopic detail the result of following these instructions, to wit, that the woof was generally covered, the warp was generally uncovered and the spaces between the threads were relatively free.

The Special Master paid little attention to the similarity of ideas suggested by Dr. Kirkpatrick and Rand and seemed more impressed by the facts that Dr. Kirkpatrick had never made any laboratory tests as to the degree of porosity, the composition of the aluminum paint or the results of dry-cleaning. These are elements, however, which are wholly consequential—not "inventions." As to Cavanaugh the Special Master found that the bronze powder suggested was different from the metal flakes and the coating of Rand. This, however, is immaterial because the patent does not cover inventive claims for a particular formula for flakes or coatings. Failure to make certain tests or examinations and the fact that no commercial use for fabric linings was made of the knowledge previously available are not determinative. In Zephyr American Corp. v. Bates Mfg. Co., supra, the court explicitly rejected any standard based on success or mechanical perfection of the prior art. "It is immaterial, on a question of anticipation by a prior device, whether it was ever put into commercial use or not. Collins v. Emerson, 1 Cir., 82 F.2d 197, 201. So long as it embodies the same construction and principle as the alleged invention, its disclosure in a publication is effective as anticipation even though its construction be crude or its operation imperfect" 128 F.2d at page 380, 385. Likewise " * * * It is irrelevant that the inventors of prior devices failed to describe or appreciate all their advantages (in this case, the prevention of undesirable heating of the frame rods). Consolidated Bunging Apparatus Co. v. Metropolitan Brewing Co., 2 Cir., 60 F. 93, 97". Gentzel v. Manning, Maxwell & Moore, Inc., 2 Cir., 1956, 230 F.2d 341, 343, certiorari denied 1956, 352 U.S. 840, 77 S.Ct. 63, 1 L.Ed.2d 57.

Similarly, the decision in Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 2 Cir., 1957, 247 F.2d 343, certiorari denied 1958, 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed.2d 529, where wholesale research by the particular industry had failed to bring forth the patented product, is inapplicable. Rand did not gain fruition out of the abandoned efforts of the Canadian and the Fourt research groups. Their reports show that the light coating necessary to preserve the normal characteristics of clothing resulted in an advance of reflectivity that was in their opinions ineffectual. Rand chose to accept this combination. While it may be true that the requirements of military garments are higher than those of garments for public consumption, the conclusion is inevitable that the advent of Milium, a product whose congregation of elements had previously been rejected, did not constitute an improvement over the earlier work. That appellee chose to put into production a fabric so processed is not tantamount to compliance with constitutional inventive standards.

■ On the subject of invention the Special Master relied almost exclusively on favorable acceptance by the consuming public and "a recognized want of a product having the qualities of the patented product coupled with unsuccessful attempts to produce it." The commercial success of almost every new article which has appeared on the market in recent years is the result of intensive advertising campaigns. In fact it is a primary function of good advertising to make the public conscious of a long felt want for

11 How. 248, 13 L.Ed. 683, to the extent that section 103 entails a modicum more than in fact anticipation, it has not here been satisfied.

the first time—a process not dissimilar to starting a tradition. A conclusion of invention derived from this circumstance, however, does an injustice to this modern-day art of salesmanship. Furthermore, the fact that appellee "is receiving the tribute of the payment of very substantial royalties by licensees" merely means that these licensees have chosen to capitalize on appellee's publicity and process. Their failure to challenge the validity of the patent does not establish invention. Only where the question of patentability is close is commercial success a makeweight factor. However, if invention is plainly lacking, such success cannot fill the void. Jungersen v. Ostby & Barton Co., 1949, 335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973; Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721; Toledo Pressed Steel Co. v. Standard Parts, Inc., 1939, 307 U.S. 350, 356–357, 59 S.Ct. 897, 83 L.Ed. 1334; Zoomar, Inc. v. Paillard Products, Inc., 2 Cir., 1958, 258 F.2d 527, 530; Magnus Harmonica Corp. v. Lapin Products Inc., 2 Cir., 1956, 236 F.2d 285, 287; Welsh Manufacturing Co. v. Sunware Products Co., 2 Cir., 1956, 236 F.2d 225, 228.

■ In summary, appellee had available to it an idea propounded many years before 1949 and with skilled artisans, equipment and finances at hand experimented with, and ultimately produced, a

coated fabric to which it ascribed certain qualities. It even used Dr. Kirkpatrick's Report title "Warmth Without Weight." Whether the fabric possesses these qualities is a subject of dispute between the parties which need not be here decided.[12] Suffice it to say that appellants to serve their own commercial interests were ready enough to try to outdo appellee in their advertising claims for Temp-Resisto. Their current recantation may well have been caused by scientific truths gleaned for the first time in preparation for trial but whether the product failed to fulfill the promise of the advertised claims is not in issue here.

Recent decisions of this circuit have declared invalid patents covering subject matter amounting to more of a departure from the prior art than that of Rand: Tatko Bros. Slate Co. v. Hannon, 2 Cir., 1959, 270 F.2d 571 (slotted pallet for transporting slate products); E. J. Brooks Co. v. Stoffel Seals Corp., 2 Cir., 1959, 266 F.2d 841, certiorari denied 1959, 80 S.Ct. 184 (metal poultry tag which did not pierce the skin); Surgitube Products Corp. v. Scholl Mfg. Co., 2 Cir., 1959, 262 F.2d 824 (open-ended tubular bandage); Savoy Leather Mfg. Corp. v. Standard Brief Case Co., 2 Cir., 1958, 261 F.2d 136 (brief case with detachable carrier secured to the ring binder); Zoomar, Inc. v. Paillard Products, Inc., supra (variable focal length lens system for moving picture and television cameras); Magnus Harmonica Corp. v. Lapin Products, Inc., supra (harmonica

---

12. The Master found that Milium was useful because it displayed a substantially higher reflectivity than ordinary cloth, although well below the minimum set by the military researchers. This finding of fact may be accepted but nowhere in the record is there a finding that the fundamental claim of the patent has been achieved. Putting to one side all the pseudo-scientific language that occupies the patent application as well as most of the testimony, the question remains, is one who wears a coat lined with Milium any warmer than he would be wearing a coat identical but for its incorporation of an untreated lining? It is conceded that even a great increase in reflectivity will not bring about better insulation unless there is also an air space. Indeed it appears that where the metal surface is positioned directly against the outer cloth, there may be an actual loss of heat due to the conduction from the metal to the fabric. Undoubtedly some spaces form in the typical overcoat as it hangs from one's shoulders, but these hardly encompass a distance of one-half to one inch, and in certain places of body extremity, e. g., shoulders, chest, hips, the spaces will be virtually non-existent. It is sufficient, however, to merely hold that Milium is not a significant advance from the experience of the research groups.

made from plastic reeds and reed plate in one piece). Cf. Georgia-Pacific Corp. v. United States Plywood Corp., 2 Cir., 1958, 258 F.2d 124, certiorari denied 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112, where the cross-grained and grooved plywood striation constituted a substantial improvement in reducing cracking and checking in solid-faced plywood and hence the patent was sustained.

In short, Rand's suggested product cannot be said to be an invention and the judgment must be reversed.

## Infringement

Long before the Rand patent issued, appellants sent a sample of Milium to the Southbridge Finishing Company and requested imitation. After experimentation (the amount of time required is not material) and without the aid of the Rand patent this company produced a fabric (Temp-Resisto) which "will equal milium for quality." After painstaking examination and analysis the Special Master found that there was sufficient similarity to warrant the conclusion of infringement. Appellants strongly argue that neither Milium as produced by the knife-coating process or Temp-Resisto (also knife-coated) come within the Rand patent. The findings of the Special Master, affirmed by the trial court, as to infringement are accepted as supported by the proof.

## Counterclaims

■ With regard to the counterclaims, despite the bulk of the briefs and portion of the record devoted to these antitrust allegations, examination exposes their highly legalistic and defensive nature. For this reason they may be treated summarily. The Special Master found, on the basis of substantial evidence, that there was no conspiracy between appellee and its licensees (including the additional defendants) to monopolize the metal-bearing garment lining trade or to fix prices and that appellee did not indulge in discriminatory advertising allowances or compete unfairly. The district court properly affirmed these findings. Even if these findings were clearly erroneous, the claims would be barred on an entirely separate ground, viz., there was no showing that appellants were damaged by appellee's activities (other than the damage, in theory, e. g., price reduction, which results from healthy competition).

On the conclusions relating to the patents—validity, injunction and accounting, the judgment is reversed with directions to dismiss the complaint; that part of the judgment which dismissed the counterclaims is affirmed.