AUDIO DEVICES, INC., Plaintiff-Appellee,

v.

ARMOUR RESEARCH FOUNDATION OF ILLINOIS INSTITUTE OF TECHNOLOGY, Defendant-Appellant.

No. 373, Docket 26805.

United States Court of Appeals Second Circuit.

Argued June 22, 1961.

Decided July 31, 1961.

Thomas F. Reddy, Jr., New York City (Merton S. Neill, James G. Foley, John T. Farley, Ambrose A. Arnold, and Pennie, Edmonds, Morton, Barrows & Taylor,

New York City on the brief), for plaintiff-appellee.

Carlton Hill, Chicago, Ill. (Benjamin H. Sherman, Chicago, Ill. and Kane, Dalsimer & Kane, New York City on the brief), for defendant-appellant.

Before CLARK and SMITH, Circuit Judges, and DAWSON, District Judge.

### J. JOSEPH SMITH, Circuit Judge.

Armour Research Foundation of Illinois Institute of Technology (Armour), holder of the Camras U. S. Patent No. 2,694,656, for magnetic recording tape, magnetic iron oxides suitable for use in magnetic recording tape, and methods of production of the oxides, appeals from an adverse judgment in a declaratory judgment action brought by Audio Devices, Inc. (Audio), accused of infringement, against Minnesota Mining and Manufacturing, a licensee under the patent (Minnesota or 3M), and Armour, in which Armour filed a compulsory counterclaim for infringement. Issues of non-enforceability by reason of misuse of the patent, anti-trust law violation and lack of personal jurisdiction over Armour were withdrawn by pre-trial stipulation. The court, Hon. John M. Cashin, Judge, found lack of invention and anticipation by the prior art. It granted declaratory judgment of invalidity and dismissed Armour's compulsory counterclaim for infringement seeking damages and other relief. 1960, 190 F.Supp. 189.

The patent in suit, U. S. Patent No. 2,694,656 issued November 16, 1954, on applications of July 25, 1947 and August 30, 1947. It was held invalid in Armour Research Foundation, etc. v. C. K. Williams & Co., D.C.E.D.Ill.1959, 170 F.Supp. 871, affirmed 7 Cir., 1960, 280 F.2d 499, certiorari denied 1961, 365 U.S. 811, 81 S.Ct. 690, 5 L.Ed.2d 691.

The claims in suit on which appellant relies are numbers 3, 5, 6, 25 and 26, which are as follows:

"3. A ferromagnetic iron oxide material adapted to form an element of a magnetic impulse record member, said material consisting essentially of acicular crystalline particles uniformly small in size and not over 6 microns in their greatest dimension of a synthetic magnetic oxide of iron selected from the group consisting of magnetic ferrosoferric oxide, $Fe_3O_4$, and magnetic gamma ferric oxide, $Fe_2O_3$, the selected synthetic magnetic oxide of iron having a cubic lattice structure, and said material having a coercive force value of between 200 and 550 oersteds and a ratio of $B_{fm}/B_r$ at $H = 1000$ of not over 3 to 1.

"5. A magnetic impulse record member having a non-magnetic carrier and a coating adherently bonded thereto of magnetic material and a binder therefor, said magnetic material consisting essentially of a magnetic synthetic iron oxide selected from the group consisting of ferrosoferric oxide, $Fe_3O_4$, and gamma ferric oxide, $Fe_2O_3$, formed from a non-magnetic iron oxide of the group consisting of alpha ferric oxide monohydrate and the anhydride thereof, said selected iron oxide being in crystalline form of a uniformly small size less than 6 microns in greatest dimension and having a coercive force of between 200 and 550 oersteds, said magnetic material having a $B_r$ versus H characteristic that rises most rapidly at fields between 200 and 600 oersteds and relatively slowly at fields between 0 and 200 oersteds and at fields above 600 oersteds.

"6. As a new article of manufacture, a magnetic impulse record member comprising a thin, flexible, non-magnetic support, and adhered thereon, a layer of magnetic synthetic iron oxide selected from the group consisting of ferrosoferric oxide, $Fe_3O_4$, and gamma ferric oxide, $Fe_2O_3$, formed from a non-magnetic iron oxide of the group consisting of alpha ferric oxide monohydrate and the anhydride thereof, said selected iron oxide in its as-produced condition being in the form of elongated

particles having characteristically a length-to-width ratio of about 2.5 to 1 and higher and being of acicular crystalline form and of a uniformly small particle size less than six microns in greatest dimension and having a coercive force of between 200 and 550 oersteds.

"25. Ferromagnetic iron oxide selected from the group consisting of a synthetic ferrosoferric oxide, $Fe_3O_4$, and of a synthetic gamma ferric oxide, $Fe_2O_3$, adapted to form an element of a magnetic impulse record member, said iron oxide consisting essentially of uniformly small elongated crystals of less than about 1.5 microns maximum dimension having a length-to-width ratio of about 2.5 to 1 and higher, and having a cubic crystal lattice structure and a coercive force, $H_c$, within the range of 245 to 330 and remanence, $B_r$, of above about 500 gauss.

"26. A magnetic impulse record member having a non-magnetic carrier and a coating adherently bonded thereto of a binder and magnetic material, said magnetic material being the ferromagnetic iron oxide defined in claim 25 and having a $B_r$ versus H characteristic that rises most rapidly at fields between 200 and 600 oersteds and relatively slowly at fields between 0 and 200 oersteds and at fields above 600 oersteds."

Magnetic sound recording had been known in the United States for some years, using magnetized wire as a recording medium, when United States research teams in Europe at the end of World War II became interested in German use of tape coated or impregnated with magnetic iron oxide as a medium, which had brought about a great improvement in fidelity of reproduction. Camras as a student had written in 1942 a thesis on magnetic recording on steel wire. In 1945 Camras began investigating the use of magnetic iron oxide coated on tape. The German development in the field had been set forth in 1936 in the Johnson British patent of I. G. Farben. Camras found that, as had been indicated in the Johnson patent, the oxides $Fe_3O_4$ and gamma $Fe_2O_3$ were most suitable. He found that a high coercive force $H_c$ (resistance to demagnetization) of 200–550 oersteds at applied fields of $H = 1000$ gave good response at slow tape speeds. Above 550 was undesirable because of difficulty in erasing. He also claims as a critical teaching in the patent in suit that the residual magnetization curve $B_r$ v. H should present a relatively gentle slope to a point of about 250 gauss, to eliminate cross-talk caused by transfer from adjacent layers of tape, a rapid rise in the curve at fields between 200 and 600 oersteds, claimed to reduce distortion in recording, and a flattening out thereafter for ease in erasing, a remanence ($B_r$—magnetism remaining after the saturating field is removed) of above 500 gauss, which should be relatively high in relation to maximum ferric induction ($B_{fm}$—total magnetism while saturating force is present) resulting in a low $B_{fm}/B_r$ ratio, claimed to assure better sensitivity and frequency response. He also taught that the magnetic particles should be acicular (needle shaped) of small size preferably less than 1.5 microns (1/1000ths of a millimeter) in maximum dimension of precipitated and grown starting material.

Camras sent some of the oxide powder which he had made to Minnesota in 1946 for coating on tape. Minnesota sent Camras 20 reels and shortly thereafter made its own oxides and subsequently filed patent applications which were later placed in interference with Camras' application which eventually became the patent in suit. In May 1947 Minnesota took a license from Armour under which it sold during the years 1947–1959 some $92,000,000 worth of tape and paid royalties in excess of $1,300,000.

Before Camras' work on the oxides, a number of published references existed disclosing methods of producing magnetic iron oxides. The references themselves had nothing to do with magnetic

recording tapes. The 1936 British Johnson patent, however, indicated that these magnetic oxides, black ferrosoferric oxide ($Fe_3O_4$) and reddish-brown gamma ferric oxide ($Fe_2O_3$) were especially suitable for use on recording tapes and that high coercive force and extremely fine particles of uniform size were desirable qualities in achieving satisfactory recording magnetic oxides.

The appeal from the finding of invalidity of the method claims 8, 10 and 14, is not pressed and understandably so, for they are anticipated by the prior art, particularly in the Bureau of Mines Bulletin No. 425 (1941) "Magnetic Separation of Ores" and in the Japanese pigment patent No. 148,643 (1941). The Japanese patent is not as specific as the method claims of the Camras patent on the reduction temperature, but did teach that it should be "below sintering temperature" leading to the same result.

Various tapes, including prior art German tape, tape made with prior art oxide made according to a Welo and Baudisch article of 1934 at inter partes demonstrations, tape made with prior art oxide, made according to the Japanese pigment patent 148,643 (1941), tape made with natural iron oxide, Goethite, and tapes made in accordance with the Camras patent as made in 1947 and 1955 were recorded and played before the trial court. The court found no significant difference in the performance of these tapes and found any variation in the tapes to be minor.

The court also found that Camras' act in selecting a certain oxide and adapting it to use as a magnetic recording medium was merely a step in the natural progression of the art which was not beyond the standard of ordinary skill of workers in the recording field. The court held therefore that the presumption of validity arising from the granting of the patent had been overcome and that the patent was invalid.

In this the court was clearly correct. The statute, 35 U.S.C. § 103, provides: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." Under this test, Camras' tape was not an invention. Magnetic recording had been known since 1900. Most of the qualities desirable in a recording member were known and described by Camras in his 1942 thesis on wire recording (high coercive force, shape of the magnetization curve, high remanence). The use of synthetic starting materials is surely an obvious means of avoiding impurities.

The claims relied on set forth qualities of the magnetic iron oxides themselves (3, 25), and of the oxides attached to the recording tape (5, 6 and 26). Insofar as they direct the use of ferrosoferric oxide and gamma ferric oxide, the claims were anticipated by the Johnson patent, which described these oxides as "especially suitable" for electromagnetic recording of sound. The Johnson patent also anticipates their direction that particles be of extreme fineness and uniform in size. The Johnson patent stated that its method of producing magnetic oxides yielded particles of the size of 1 micron or less. The Camras patent calls for "crystalline particles uniformly small in size and not over 6 microns in their greatest dimension" (claims 3, 5, 6), "uniformly small elongated crystals of less than about 1.5 microns maximum dimension" (claim 25 and, by incorporation, claim 26). The Camras claims are thus broadly and generally stated in terms that encompass the Johnson disclosures, and were therefore anticipated by Johnson insofar as size is concerned.

Camras similarly fails to disclose much advance over Johnson in his prescription of a high coercive force. Johnson designated a "high coercive force" as ensuring "good stability of the sound recording."

The Camras patent is slightly more specific in this respect, but it suggests a variety of ranges, and fails to establish that any particular range is especially critical. Claims 10 and 14 call for a coercive force of at least 200 oersteds, claims 3, 5, 6 and 8 call for "a coercive force of between 200 and 550 oersteds," and claims 25 and (by incorporation) 26 call for "a coercive force, $H_c$, within the range of 245 to 330." The last range mentioned, plus the range of 290–360 (claim 1) and 220–290 (claim 2) is not designated as a range in the specifications. In explaining why so many different ranges were set forth, Camras testified that "we give a broad range which is 200 to 550," within which the preferred range is from 275 to 400 (App. 659). However, this preferred range of 275 to 400 is not made the basis of any claim, and the various ranges set forth by Camras were admitted by him to be simply "exemplary of the best materials." Moreover, the Camras figures for coercive force lack "criticality," as that term was used in Helene Curtis Industries, Inc. v. Sales Affiliates, Inc., 2 Cir., 233 F.2d 148, 152–53, certiorari denied 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80. For, after Johnson disclosed the desirability of high coercive forces, Camras chose a series of ranges meeting that description, without showing that the particular ranges chosen had particular significance. While the court below relied on the lack of invention, and did not pass on the "criticality" point as such, the absence of criticality itself demonstrates a lack of invention over the Johnson patent.

Whether or not Johnson itself anticipates the Camras coercive force criteria, Johnson considered in connection with the remaining prior art clearly does. There is ample evidence in the record that coercive forces of between 200 and 550 could be produced by methods already existing at the time Camras set to work.

The originality, if any, must come from Camras' combining with the high coercive force criteria the other criteria set forth in his oxide and oxide-on-tape claims.

These additional criteria, referred to above, are:

1. A ratio of $B_{fm}$ (total magnetism while saturating force is present)/$B_r$ (remanence, or magnetism remaining after the saturating force is removed) of not over 3–1 (claim 3).

2. Remanence, $B_r$ of above about 500 gauss. Claims 25 and (by incorporation) 26.

3. A $B_r/H$ characteristic that rises most rapidly at fields between 200 and 600 oersteds and relatively slowly at fields between 0 and 200 oersteds and at fields above 600 oersteds (claims 10, 26).

4. Acicularity. Since Camras admitted that the same qualities could generally be obtained without acicularity, this does not appear essential to the invention. See Armour Research Foundation v. C. K. Williams & Co., supra, 280 F.2d at page 504, noting also that use of acicular particles on recording tapes was old.

Appellant asserts that the genius of Camras' invention lies not in the discovery of these individual qualities, but in their combination. The difficulty with this argument is that the claims do not show all of these allegedly significant criteria in combination. Thus, the $B_{fm}/B_r$ ratio of less than 3–1 is set forth only in combination with the specification of a coercive force value of 200 and 550 oersteds (claim 3). This ratio was obtained by following the Bureau of Mines procedure under which ferrosoferric oxides were produced with $H_c$ (coercive force) of between 200 and 550. Thus, claim 3 was anticipated by that document alone, without reference to the other prior art relied on by the district court.

The remaining combination of qualities is the remanence of above 500 gauss and the $B_r/H$ characteristic shape, set forth in claims 25 and 26. The black oxide produced by following the Japanese patent had this approximate shape (rapid rise between 250 and 600 oersteds), to-

gether with a remanence of 580 gauss, a coercive force of 262 oersteds and a $B_{fm}/B_r$ ratio of less than 3–1. The appellant protests that the Japanese experiment was not conducted at the temperature specified in the Japanese patent, but it seems that the 800° C. set forth in that patent is correctly found to be the external, rather than the internal temperature. Furthermore, to the extent that the optimum temperature could not be definitely ascertained from the Japanese patent, it could be obtained from the Bureau of Mines Bulletin, which specified the temperatures which best produce a high coercive force. If the Japanese procedure would produce a product having the qualities set forth in the Camras criteria, it does not cease to be anticipatory solely because the Japanese patent did not point to the use of its product on recording tape. George P. Converse & Co. v. Standard Packaging Corp., D.C.N.J., 175 F.Supp. 819, 823, holding that a patent for a bag-making machine was anticipated by patents covering tire patching machines. The characteristic $B_r/H$ shape, together with a remanence of over 500 gauss, was also produced by following the Bureau of Mines procedure, although the testimony as to the $B_r/H$ shape was a little general in nature. In short, products having the qualities set forth by Camras could be produced by reference to existing chemical knowledge, and, in view of the Johnson patent, there was no novelty in applying these products to the new use of magnetic recording.

■■■ The district court's conclusion that Camras' subject matter would have been obvious to a person having ordinary skill in the art is supported by the evidence that Minnesota without instruction from Camras or Armour promptly produced for itself oxides having Camras' characteristics. The person having ordinary skill in the art is a person skilled in the recording art here involved, Zoomar Inc. v. Paillard Products, 2 Cir., 1958, 258 F.2d 527, 529, and presumably familiar with its literature. If Camras did anything here, he merely recognized latent qualities in the pre-existing art. This is not invention. General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43. The first to describe to the U. S. Patent Office something old but useful cannot thereby obtain a monopoly and control the field of its use. The usual presumption of validity from the grant of the patent is substantially weakened hereby by the failure of the examiner to consider much of the prior art, such as the Japanese patent and the full Bureau of Mines Bulletin, see Georgia-Pacific Corp. v. United States Plywood Corp., 2 Cir., 1958, 258 F.2d 124, Zoomar Inc. v. Paillard Products, supra, and by the finding of invalidity by the courts of the Seventh Circuit in the C. K. Williams case, supra. If invention is plainly lacking, commercial success, even if ascribable here to the tape development rather, than to other elements in the recording systems, "cannot fill the void." Deering, Milliken & Co. v. Temp-Resisto Corp., 2 Cir., 1960, 274 F.2d 626, 633.

The judgment is affirmed.