Ernest Samuel NOSSEN and E. S. Nossen Laboratories, Inc.

v.

The UNITED STATES.

No. 350–61.

United States Court of Claims.

Oct. 17, 1969.

---

55. United States v. Anthony Grace & Sons, Inc., *supra*.

David Toren, New York City, attorney of record for plaintiffs. McGlew & Toren, New York City, of counsel.

Martin Avin, with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant. Roland A. Anderson and John A. Horan, Washington, D.C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

NICHOLS, Judge.*

This is a patent suit under Title 28 U.S.C. § 1498 (1964) for reasonable and entire compensation for the unauthorized use of plaintiffs' patented invention. Plaintiffs allege infringement of claims 1, 2, 4, 6, 7, 8, 9, and 12 of U.S. Patent No. 2,737,445, issued on March 6, 1956, to plaintiff Ernest Samuel Nossen for "Process for the Thermal Decomposition of Metal Nitrates." The application for patent was filed September 14, 1951. Plaintiff E. S. Nossen Laboratories, Inc. is the exclusive licensee under U.S. Patent No. 2,737,445. The parties have agreed to defer trial of any accounting issues until the issues of patent infringement and patent validity are decided.

It is determined that claims 1, 2, 4, 6, 7, 8, 9, and 12 of the patent in suit are invalid in view of the prior art.

That patent describes and claims a process for the thermal decomposition of a number of specified metal nitrates, including those of uranium and aluminum. The alleged invention resides in the discovery that nitric acid vapors are directly and substantially instantaneously formed by subjecting the defined metal nitrates to a temperature higher than their decomposition temperature in the presence of steam. Nitric acid in its liquid form is recovered from the nitric acid vapors. Practice of the invention is said by the plaintiffs to decrease the overall cost of the decomposition reaction by eliminating the need for equipment to convert nitric oxide, which is produced by prior art decomposition processes, to nitric acid. The patent disclosure and patent claims in suit are described in detail in the accompanying findings of fact.

Claim 1 of the '445 patent reads: [Indentation added.]

1. A process for the thermal decomposition of a metal nitrate of which the metal is selected from the electromotive series starting with magnesium towards and including the noble metals and which forms the unstable $N_2O_5$ as primary gaseous product when decomposed, into a solid product and nitric acid comprising the steps of:

(a) subjecting the metal nitrate to a temperature higher than the temperature of its decomposition in the presence of a continuous flow of steam, liberating unstable $N_2O_5$ and

(b) causing its reaction with said steam before it breaks down into lower nitric oxides, to form nitric acid vapors and a solid product and

(c) condensing said nitric acid vapors for recovery of the nitric acid in its liquid form.

Claim 2 is similar to claim 1. In claim 2 an added gas is recited to be intro-

---

* The case was tried before our former Commissioner, now Judge, Donald E. Lane, who submitted an original and a supplemental opinion, with fact findings, all of great value to us. We agree with his findings with minor modifications, and his conclusions, but we deem a new opinion necessary to deal with plaintiffs' numerous exceptions urged before us.

duced *along with the steam.* In claim 4, which is dependent on claim 2, the added gas is required to be inert to nitric acid. While the process steps of claim 6 generally correspond to claim 1, claim 6 differs by reciting that an *aqueous* metal nitrate solution rather than an unspecified form of metal nitrate is decomposed. The decomposition of the aqueous solution liberates the steam necessary for the process. Claim 1, which is dependent on claim 6, requires that the metal nitrate solution be subjected to the thermal decomposition temperature in the form of a thin film. Claim 8 recites that an added gas is present during the decomposition reaction and in other respects it corresponds to claim 6. Claim 9 depends on claim 8 and contains the additional limitation that the aqueous solution of metal nitrate is subjected to the decomposition temperature in the form of a thin film. Claim 12 is also dependent on claim 8 and requires that the added gas contain oxygen.

The nitrates may be obtained by dissolving metals or metal oxides in nitric acid. In that case the invention recovers the nitric acid for recycling. The nitrate may be used in dry form but "it may be more convenient" to use an aqueous nitrate solution. A "preferred embodiment" is to spray the solution on an internally heated rotating drum, thus forming a "thin film." The solution water "flashes off" to provide the needed steam, leaving the solid product deposited on the drum, whence it is scraped off by a properly placed knife in the course of the drum's rotation.

Plaintiffs' claims further assert that the metal nitrate breaks down in the presence of steam, at its decomposition temperature, to form $N_2O_5$ (nitrogen pentoxide), which then combines with water to produce the nitric acid, all substantially in a flash.

The alleged infringements consist of processes employed in two of defendant's Atomic Energy Commission plants to recover nitric acid from uranyl (uranium) nitrate.

The prior art relied on by defendant consists of a number of patents and other disclosures. We deem to be decisive, German Patent No. 556,882, issued to Dr. Fritz Gewecke on August 15, 1932 (defendant's exhibit 14, with English translation), and two articles by this same Dr. Gewecke, one in *Die Chemische Fabrik,* No. 21–22, pp. 199–209 (1934) (defendant's exhibit 7, and translation, 8), the other in *Chemiker-Zeitung,* No. 15, pp. 157–58 (1936) (defendant's exhibit 17, with translation).

The Gewecke patent discloses a continuous process for the decomposition of aluminum nitrate by means of heat into aluminum oxide with the substantially complete recovery of nitrogen as nitric acid alleged. In explaining the state of the art prior to his invention, Gewecke mentions problems inherent in the complete thermal decomposition at high temperatures of aluminum nitrate, including high heat losses, and loss of nitric acid in the form of nitrous gases. The Gewecke patent states that in the prior art, liquid-state decomposition reactions which were accomplished by adding water during the heating of the aluminum nitrate solution allowed a recovery of 70 percent of the nitric acid. However, the remaining 30 percent of the nitric acid was recoverable only by subjecting the reaction materials to objectionable high temperatures. On the other hand, Gewecke's patent process, so far as here pertinent, involves jet spraying of a concentrated aluminum nitrate solution upon solid particles of aluminum oxide, and heating in vacuo and/or by passing steam or gases over the mixture. Gewecke first concentrates an aluminum nitrate solution to attain a temperature of approximately 135° C. This hot solution is subsequently jetsprayed onto agitated particles of aluminum oxide to obtain an easily handled material suitable for continuous further treatment, as claimed. The aluminum nitrate-aluminum oxide mixture may be heated in vacuo and/or by passing steam or gases over the mixture. No upper temperature for the heating step

is mentioned in the German Gewecke patent. Gewecke has titled his patent "Process for the Thermal Decomposition of Aluminum Nitrate." Gewecke says the process is continuous, not "batch-wise." The low decomposition temperatures referred to as desirable by Gewecke must be read in light of his discussion of the high temperatures previously required for complete thermal decomposition. In summary , the Gewecke patent discloses the complete thermal decomposition of one of plaintiffs' claimed metal nitrates by (a) heating the metal nitrate in the form of a thin film to a temperature higher than the temperature of its decomposition, (b) in the presence of steam to obtain a solid product and substantially complete recovery of all nitric acid.

The 1934 Gewecke article, so far as here pertinent, describes groups of laboratory experiments in the "thermal clevage" of aluminum nitrate. Nothing is there said about their being continuous and they are construed as being performed "batch-wise." One group deals with hydrolytic cleavage, i. e., in an aqueous solution, at various temperatures. (Plaintiffs here say that aluminum, iron, and bismuth nitrates are subject to hydrolysis, i. e., chemical decomposition in water, which is accelerated by heating the water, but that uranium and the other metals referred to in their patent are not.) As the water evaporated off, Gewecke reports, nitric acid vapors also were formed. By repeatedly diluting and rediluting the water, over a long period of time, up to 70% of the nitric acid was recoverable. Next, Gewecke heated solid aluminum nitrate crystals at various temperatures, producing, as before, both water vapor and nitric acid (the crystals at certain temperatures melt in the water crystallization which they contain). Reactions were speeded up and recovery better when the experiment was performed in a partial vacuum or with inert gases. The article proceeds to consider experiments in the thermal decomposition of ferric nitrate, and concludes with the statement, apparently applicable to the dry decomposition of aluminum nitrate, that with care the loss of nitric acid as nitrous gases was only 5% to 10%.

The 1936 *Chemiker-Zeitung* article attempted to demonstrate that it was possible to produce aluminum from German clay, eliminating the drain on reichmarks in the purchase of imported bauxite. The intense pace of German rearmament at that time, in preparation for World War II, and her consequential foreign exchange difficulties, are well remembered. The article described the patented "Nuvalon" process which, after preliminary steps, ending with a filtered aluminum nitrate solution, subjected this "decomposition solution" "directly, or after precipitation of aluminum nitrate crystals [*i. e.*, by two alternative methods] to evaporation and cleavage." The nitric acid was "recycled." The article footnoted the earlier one for "the details and theoretical bases."

The article further said the decomposition solution, "respectively" [alternatively?] the crystals, may be "worked up further in different ways." One way was to heat the aluminum nitrate to 300–400° centigrade while passing steam over it, leading to direct recovery of 90% of the nitric acid. The remaining nitrous gases could be regenerated in a small installation. This looks like the dry crystal method of the 1934 article. An alternative is offered, to react the decomposition solution with alkalis such as ammonia. There is a diagramatic flow sheet which shows the filtered aluminum nitrate solution flowing into an evaporator. From there it goes into a slanted object which may be a rotary calciner. It is called a calcining oven. Out of the lower end of this oven comes the aluminum oxide or alumina. From the upper end a line goes to a reservoir where the nitric acid is held for recycling. It is possible but not certain that the diagram may portray the patent agitated bed method. It may portray the dry crystal method described in the text. It may cover both, or some other.

We now turn to the fascinating feature of this case: what plaintiffs and defendant make of these disclosures.

First, as to the 1932 patent. Defendant's expert says, and our commissioner agreed, that the process was in every essential the "thin film" technique. (Dr. Nossen himself testified that the "thin film" technique includes spraying the metal nitrate on a "fluidized" or "moving" bed of the metal oxide.) The agitation of the bed of aluminum oxide particles under a spray of aluminum nitrate solution serves, apparently, to coat the particles with the solution, the water and nitric acid flashing off, and aluminum oxide remaining behind as a solid, continuously laminating the particles of the original bed. The patent claims the process is "continuous", not batch type.

This analysis implies that the bed is continuously maintained at a temperature at or above the temperature of thermal decomposition of aluminum nitrate, say 180° C., but the patent nowhere expressly says this, an omission through which plaintiffs seek to drive a team of horses, as will appear. Plaintiffs argue in their exceptions that the hot solution is sprayed on the agitated bed while it is cold, heat from steam or otherwise being applied only after the mixture is set. Thus the agitating and spraying of themselves do not accomplish any thermal decomposition, but create an apparently unmanageable solid or doughy mass, resembling some peculiary unattractive breakfast food. There is no explanation how the thermal decomposition is then accomplished. It would seem to be made more difficult rather than easier by these patent steps, as construed by plaintiffs.

This interpretation seems not to account for Gewecke's claim that the process is continuous. It comprises of necessity, alternatively heating the bed and chilling it, a batch process, the opposite of continuous. Moreover, it imputes to the German patent office the ultimate absurdity of patenting a process to make nitric acid in which the disclosures stop short of any production of nitric acid.

In the next to last paragraph before the claim, Gewecke states that it had previously been proposed to mix the product to be calcined [i. e., decomposed] "with calcined product prior to the heat treatment." (Emphasis supplied.) This he states is disadvantageous because of "complication of plant" due to "the necessity of operating in a batch-wise manner." In contrast to the above, his process assures an "easy and convenient continuous decomposition" in which recovery of the nitric acid is "nearly complete." Yet plaintiffs' construction of the patent reads it as disclosing a process practically the same as the former process Gewecke proposed to supersede. Since Gewecke rejects mixing and then heating as "batch-wise" he must intend in his own "continuous" process to spray, mix, and heat simultaneously, though he does not say so expressly.

While defendant's expert witnesses construed the Gewecke patent according to their position, plaintiffs offered no testimony to support their interpretation, and it must stand on the authority of plaintiffs' able counsel alone.

In reality what plaintiffs appear to be doing is to ridicule the cloudy phraseology and lacunae that do indeed exist in the Gewecke patent, at least in its English translation. If Dr. Gewecke were with us today, no doubt he would be thoroughly irked. But the display, brilliant as it is, gives little help to the court in seeking, as we conceive we must, the true meaning and intent of the patent. In construing a document, you cannot beat an interpretation that makes sense with one that does not. It is ambiguous only if more than one construction are all intelligible. Defendant's notion of a continuously hot bed is more helpful to the court than plaintiffs' of an alternately hot and cold one, supposing both were possible under the literal language, because defendant postulates a concept that a member of the most brilliant scientific community in the Western world—as that of Germany was reputed to be— might conceivably have deemed it worth while to patent. Plaintiffs suggest noth-

ing to show how their interpretation might have made any sense, in 1932 or any other time.

■ So far as plaintiffs' interpretation of the Gewecke patent supports a legal argument it is that this patent does not invalidate the '445 patent because it does not disclose all the elements of the patent to be invalidated in full, clear, and exact terms, as a foreign patent must do. Badowski v. United States, 140 F.Supp. 544, 135 Ct.Cl. 93 (1956); Dewey & Almy Chemical Co. v. Mimex Co., 124 F.2d 986 (2d Cir. 1942, per Learned Hand, J.); Aluminum Co. of America v. Sperry Products Inc., 285 F.2d 911 (6th Cir. 1960). Of course, if plaintiffs construe the Gewecke patent correctly this argument would prevail, for the patent so construed discloses nothing, even in cloudy fashion, but the extravagance of plaintiffs' interpretation is the best evidence that, given a fair interpretation, the argument will fail. We think the *lacunae* and poor phraseology of the Gewecke patent (as translated) are resolved within the four corners of the instrument, and therefore it is full, clear, and non-ambiguous.

We believe and hold that the Gewecke invention, properly construed, was to. spray continuously a hot (135° C.), concentrated solution of aluminum nitrate upon a hot, continuously agitated bed of aluminum oxide particles, in the presence of steam, producing a vapor of steam and nitric acid, and a solid lamination of aluminum oxide on the particles. So construed, it is quite similar to one of the allegedly infringing operations, defendant's "agitated bed" at Hanford, Washington.

The process of imputing folly to Gewecke continues in plaintiffs' analysis of the 1934 article. His description of a series of discontinuous laboratory experiments in "batch" or "pot" decomposition becomes, in plaintiffs' briefs, a single sequential industrial operation, though clearly Gewecke prefers for industry a continuous process. Thus, according to plaintiffs, Gewecke insists on extracting the last possible smidgen of nitric acid by hydrolysis from his solution of aluminum nitrate, although by so doing he leaves himself with a dry residue of "basic aluminum nitrate", a "degraded product" not capable of releasing nitrogen pentoxide and capable of thermal decomposition only by intense heat in the 300–400° C. range, as against 180° C., the thermal decomposition temperature of the original aluminum nitrate. Per plaintiffs, evidently Dr. Gewecke was a man who loved to do things the hard way. It seems clear from the 1936 article that Gewecke viewed decomposition of aluminum nitrate in solution, and in dry form, as alternates, not steps to be performed in sequence.

Plaintiffs have their own interpretation of the flow sheet above mentioned, which illustrates the 1936 article (exhibit 17). According to them the evaporator there shown is the place where most of the nitric acid is extracted by hydrolysis, with solid basic aluminum nitrate remaining, to be decomposed by intense heat in the calcining oven. But if this were so there should be a line from the evaporator to the recycling reservoir, to show where the nitric acid comes from. In fact, the only such line runs from the calcining oven to the reservoir, indicating, contrary to plaintiffs' belief, the nitric acid comes principally from the calcining oven. We say "principally" because the record shows that any heating of the solution in the evaporator would produce some nitric acid. Defendant says the evaporator is used only to concentrate the solution for spraying, per the patent, and that the "calcining oven" actually harbors an "agitated bed" used to carry out a "thin film" technique of decomposition. If the flow sheet does not affirmatively support this theory, at least it does not refute it, as it does the theory preferred by plaintiffs. Defendant's expert, Lawroski, testified the sheet showed "obviously a schematic of an application of a continuous type method for decomposing material." There is no opposing expert testimony as to this.

Plaintiffs urge a number of advantages that one following Nossen's teach-

ing would enjoy over one instructed by Gewecke, but in every case it appears that it is not the primeval Gewecke, but Gewecke as expounded on behalf of Nossen, who labors under such crippling disadvantages:

1. *Extraneous steam.* Gewecke, when he uses steam, per plaintiffs, gets it from an "extraneous" source; Nossen, from the water that carries the metal nitrate in solution. This derives in part from the supposed fact that Gewecke's agitated bed is cold when sprayed and the solution water presumably wasted. There is nothing to show that Gewecke would not utilize any intrinsic steam he had before resorting to an extrinsic source. There is nothing in the record to show his patented operation would not generate as much instrinsic steam as Nossen's revolving drum. There is nothing in the record to show whether the burden of producing and delivering extrinsic steam would be proportionally heavy or light compared to other costs of the operation.

2. *Dilution of the acid.* Plaintiffs urge that because Gewecke would use more steam in relation to the volume of acid produced, the acid would be more diluted on condensation. This appears also to depend on plaintiffs' arbitrary assumptions as to what the Gewecke process is.

3. *Two-step process vs. one-step.* There is nothing in the record that Gewecke intended to prescribe a two-step process. To the extent he proposed to decompose by hydrolysis a second step would have been necessary to complete recovery of the nitric acid, but there is nothing to show he did more than experiment with hydrolysis to establish its disadvantages. The 1936 article shows he visualized decomposing in solution and dry as alternatives. His patented process appears just as capable as Nossen's of doing the job in a single step, so far as the record shows. The 1936 flow sheet, according to Lawroski, shows a continuous operation.

4. *Length of time required.* This argument stems from the fallacy that Gewecke's prolonged laboratory experiments were industrial processes.

5. *To what metal nitrates applicable?* Plaintiffs argue that only the three metals nitrates they say are susceptible to hydrolysis, aluminum, bismuth, and iron, can be decomposed by the Gewecke process, as against 22 by Nossen. This assumes Gewecke's process is hydrolysis. Even by plaintiffs' own labored interpretation of Gewecke's supposed two-step process, the first only is hydrolysis. If the first step proved useless, it might occur to anyone to rely on the second for the entire job. As indicated, however, it seems more than doubtful that Gewecke, in reporting partial decomposition of a solution by hydrolysis in the laboratory, ever intended to recommend its industrial use as a first step to be followed by thermal decomposition of a water-free basic nitrate at high temperatures.

Plaintiffs' primary contentions are that the Nossen patent process requires *subjecting* a metal nitrate to its thermal decomposition temperature rather than *mere heating*, and that it also requires that the metal nitrate be subjected to said temperature in the form of a *thin film*. Plaintiffs contend that the Gewecke publications teach denitration by *hydrolysis* and *chemical cleavage* by *gradual* heating. Plaintiffs' assert that the denitrations obtained by Nossen and by Gewecke are based on different chemical phenomena and produce different results.

Defendant contends that the term *subjecting* in the Nossen patent claims encompasses rapid and slow heating processes, that the *manipulative steps* of the Nossen patent process and the Gewecke processes are *fundamentally the same* even though the parties' *theoretical* explanations for the chemical reactions may differ, that the relative number of metal nitrates mentioned by the Nossen patent and by the Gewecke publications is irrelevant, that the Nossen patent process does not produce concentrated nitric acid,

that defendant's process at Hanford does not infringe, and that the Nossen patent claims in suit are invalid.

The Nossen patent, to repeat, discloses and claims a *process for* the thermal decomposition of metal nitrates to recover nitric acid. The patent specification states that if a metal nitrate is heated to a temperature higher than the temperature of its decomposition and in the presence of steam, an unstable nitric acid anhydride, $N_2O_5$ (nitrogen pentoxide) is formed which combines with water to form the true acid in an exothermic reaction. It states that decomposition of $N_2O_5$ can be slowed down by having a high amount of oxygen present and that the nitric acid must be removed from the reaction zone to avoid its decomposition under the influence of too high a temperature. The patent specification further states that the nitric acid is recovered from the gaseous reaction products by condensation. The Nossen specification discloses that it is convenient to use acqueous metal nitrate solutions and that a sufficient quantity of water is present by continuously introducing fresh metal nitrate solution so that the reaction takes place in a thin film of material. The patent specification further states that a gas containing oxygen may be present, or an inert gas such as nitrogen or steam may be used. The Nossen patent specification suggests that the patented process may be carried out in a unit comprising a housing enclosing an internally heated rotatable drum on which the reaction takes place, the housing having an aperture and pipe for conducting gases containing nitric acid vapors to a condenser and having an aperture for the discharge of solid material and for the inlet of steam, gas and/or air. The specification states that the drum is heated to a temperature at least as high as or higher than the decomposition temperature of the metal nitrate to be decomposed. However, no equipment is illustrated in the Nossen patent and all of the Nossen patent claims are directed to processes only.

The Nossen patent specification discloses that the decomposition process may be used with all metal nitrates which in their anhydrous state develop nitrogen dioxide ($NO_2$ and/or $N_2O_4$) when heated and that the decomposition temperatures vary from 60° to 600° C., depending on the nitrate treated. The specification identifies 22 metals whose nitrates it states may be decomposed. Example I in the Nossen patent specification discloses the decomposition of aluminum nitrate solution at 190° C., and states that the same method is applicable to ferric, zinc, cobalt, nickel, chromium, manganese, and bismuth nitrate solutions at stated temperature ranges. Example II discloses the decomposition of lead nitrate in an externally heated tube with a temperature control and an attached condenser, and a first container and a second container, and states that this method is also applicable to mercuric and cadmium nitrates.

Gewecke's 1934 article (as translated) says that to achieve thermal cleavage of aluminum nitrate, it may be *subjected* to thermal decomposition. The 1936 article (as translated) says that the decomposition solution is *subjected* to evaporation and cleavage. These are Government translations, but plaintiffs' attorney, who is fluent in German, accepts them as accurate, with one correction at p. 743 of the record, which we accept. Thus the use of the word "subjecting" in Nossen's claim fails to carry the load so far as it is relied on to show a patentable difference between Nossen's processes and Gewecke's. There is nothing to show that the gradual increases of temperatures in Gewecke's experiments were recommended by him as an industrial process. Rather he seems to contemplate use of saturated or superheated steam or gases at temperatures continuously in the 300° —400° C. range. He does not declare anywhere that he derives any advantage from the instantaneous passage of the nitrate through intermediate temperatures. On the other hand, Nossen's claims and examples include decomposition of nitrates in crystal form, as well as in solution, and in the former case he indicates no method for any instanta-

neous heating to the decomposition temperature. Plaintiffs in their original requests for findings of fact in this case asserted that the Nossen patent claims in suit do not contain any limitation as to the rapidity of the heating of the metal nitrate to above its decomposition temperature. Similarities between the respective procedures taught by the Nossen patent and the Gewecke publications exist in respect to the decomposition of water solutions of aluminum nitrate and water solutions of ferric nitrate since the Gewecke disclosures do not mention the other metal nitrates. Both Nossen and Gewecke (1) use the same solutions as starting materials, (2) heat the solutions and any intermediately formed products in the presence of steam to a temperature which is at least as high as the thermal decomposition temperature of the respective metal nitrate contained in the solution, (3) obtain substantially quantitative recovery of the nitrate in the form of nitric acid, and (4) obtain the corresponding metal oxide as a solid.

A difference between the respective disclosures of the Nossen patent and the Gewecke publications is that the Nossen patent states that the nitrates of 20 metals in addition to aluminum and iron can be denitrated according to the Nossen process.

Whether or not an unstable nitric acid anhydride $N_2O_5$ (nitrogen pentoxide) is actually formed during the thermal decomposition of metal nitrates is not shown by the record and is merely a theoretical explanation advanced by plaintiffs as to what may take place during the decomposition process. Both sides tried experimentally to extract the nitrogen pentoxide or detect its presence, and both failed to do so. Plaintiffs contend that *subjecting* the metal nitrate solution to a temperature of the dissolved metal nitrate is the *crux* of the Nossen process because such subjection prevents any physical or chemical change of the starting material at an intermediate temperature, such as premature evaporation of water or hydrolytic reaction of water with the nitrate and renders the reactions recited in the patent claims possible. The plaintiffs' contention that there is a difference between heating and subjecting to a temperature is based on their argument that subjecting necessarily means exposing without going through intermediate temperatures. Plaintiffs contend that hydrolysis takes place even in the heating of dry crystals because at certain temperatures the nitrate dissolves in its water of crystallization. Consequences flow from this hydrolysis that plaintiffs say they avoid. When a particular metal nitrate solution is gradually heated up to a temperature higher than the thermal decomposition temperature of the dissolved metal nitrate, the heating may result in the formation of intermediate compounds at intermediate temperatures during the heating. If the heating is substantially instantaneous, some intermediate compounds may not be formed. However, the plaintiffs agree that the Nossen patent process and the Gewecke process both obtain substantially quantitative recovery of the nitrate in the form of nitric acid, the object of both processes. If instantaneous heating to a temperature higher than the thermal decomposition temperature of the dissolved metal nitrate was the real *crux* of the Nossen invention, it was not disclosed and not mentioned in the Nossen patent specification. It would not be proper for this court to read into the Nossen patent specification and patent claims a limitation or an interpretation not clearly disclosed therein.

■■ The Nossen patent claims in suit define a process of several manipulative steps. The Gewecke publication disclosed a process which includes the same manipulative steps. The Nossen patent claims define a process for the thermal decomposition of aluminum, ferric, or other metal nitrates. The Nossen process claimed is not different for the other metal nitrates. A reference anticipates a claim of a patent if the reference contains adequate directions for the practice of the invention claimed. See Dewey & Almy Chemical Co. v. Mimex Co., *supra*.

In contruing the process claims in suit and the references, it is an identity of manipulative operations which leads to a finding of anticipation. It is settled that the scientific explanation for an invention is unimportant in considering its patentability. De Forest Radio Co. v. General Electric Co., 283 U.S. 664, 686, 51 S.Ct. 563, 75 L.Ed. 1339 (1931). More specifically, in order to anticipate a claimed process, a reference need not disclose the scientific effects which are inherent in the process. See Templeton Patents, Ltd. v. J. R. Simplot Co., 336 F.2d 261 (9th Cir. 1964). Applying the above principles, it is concluded that the recitations in the patent claims of the formation of nitrogen pentoxide and its reaction with steam, intermediate results inherently obtained by decomposing a metal nitrate in the presence of steam, do not patentably distinguish these claims from the subject matter disclosed by Gewecke. This recitation of the formation of nitrogen pentoxide and its reaction with steam is the only novel teaching in the '445 patent in suit.

■ Claims 1 and 6 are anticipated by all three Gewecke references each of which clearly teaches the heating of an aqueous metal nitrate to above its decomposition temperature in the presence of steam. Claim 7, which cites a thin film of metal nitrate, is anticipated by the Gewecke patent and possibly also by the *Chemiker-Zeitung* article. Claims 2, 4, 8, and 12 are anticipated by the *Die Chemische Fabrik* article which discloses the presence of steam and an added gas as recited in these claims. The remaining claim 9 recites both the thin film and added gas features. Under the standards set forth by the Supreme Court in Graham v. John Deere Co., 338 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), this claimed subject matter is obvious in view of the above-mentioned prior art disclosures of Gewecke, and therefore is invalid under 35 U.S.C. § 103 (1964).

■ In holding the claims invalid, we do not ignore the statutory presumption of validity to be given an issued patent. This presumption is weakened where the most pertinent prior art was not considered by the Patent Office. See *e. g.,* Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367 (3d Cir. 1962); Audio Devices, Inc. v. Armour Research Foundation, 293 F.2d 102 (2d Cir. 1961). The teachings of Gewecke were not cited during the prosecution of the '445 patent application. Gewecke's contributions to the nitrate decomposition art are clearly pertinent to the subject matters recited in the Nossen patent claims in suit.

The defendant has attempted to introduce in evidence four documents once classified, now declassified, to show an invalidating prior knowledge or use under the provisions of Title 35 U.S.C. § 102(a) (1964). These documents were marked defendant's exhibits 19, 20, 21, and 22 for identification, but were excluded as evidence during the trial. The defendant contended that in conformity with Section 155 of the Atomic Energy Act of 1954, 68 Stat. 947, 42 U.S.C. § 2185 (1964), these documents should have been entered in evidence. This section reads as follows:

> Sec. 155. *Prior Art.*—In connection with applications for patents covered by this subchapter, the fact that the invention or discovery was known or used before shall be a bar to the patenting of such invention or discovery even though such prior knowledge or use was under secrecy within the atomic energy program of the United States.

Defendant has not briefed or argued the point before us and is deemed to have abandoned it. So also with its point that the '445 patent claims are indefinite and ambiguous.

The record contains evidence to show anticipation in a number of patents and disclosures other than Gewecke's. They are described or summarized in the findings of fact. It is unnecessary to consider them in this opinion because we hold that Gewecke's disclosures are decisive.

In summary, it is found that claims 1, 2, 4, 6, 7, 8, 9, and 12 of the U. S. Patent

No. 2,737,445 are invalid for failing to define statutorily patentable inventions thereby relieving defendant from liability for use of the process of the claims. Since all the patent claims in suit are invalid, it is not necessary to consider infringement issues. See Smith v. United States, 145 F.Supp. 396, 136 Ct.Cl. 487 (1956). Plaintiffs are not entitled to recover and the petition is dismissed.