**RESEARCH, ANALYSIS, & DEVELOPMENT, INC.**

v.

**The UNITED STATES.**

No. 231–83C.

United States Claims Court.

April 29, 1985.

---

William J. Spriggs, Washington, D.C., attorney of record for plaintiff. Spriggs, Bode & Hollingsworth, Washington, D.C., of counsel.

E. Kathleen Shahan, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., attorney of record for defendant. Capt. Dennis Cook and Col. Oris D. Dearborn, Jr., U.S. Air Force, Washington, D.C., of counsel.

OPINION

LYDON, Judge:

In this case, involving the alleged exposure by defendant of proprietary information submitted by plaintiff in an unsolicited proposal, the court is presented with plaintiff's motion and defendant's cross-motion for summary judgment. Both parties contend that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. The facts in this case, over which there is little dispute, indicate that plaintiff did submit to defendant an unsolicited proposal encompassing a technical "revolutionary" concept. Defendant acknowledged the uniqueness of plaintiff's proposed concept and agreed to safeguard the information in the proposal. Defendant subsequently published a *Commerce Business Daily* (*CBD*) release describing, at least in part, the concept proposed by plaintiff and requesting responses from interested concerns. Plaintiff perceived this publication as a violation of both defendant's agreement not to disclose information and applicable regulations.

The issues generated in this case are: (1) did an implied-in-fact contract exist between plaintiff and defendant thus giving this court jurisdiction over the dispute, and (2) if such a contract existed, was the information disclosed by defendant in the *CBD* release a violation of that implied-in-fact contract. After thoroughly considering the submissions of both parties, the applicable regulations and case law, and without oral argument, the court grants plaintiff's motion for summary judgment and denies defendant's cross-motion. The issue of quantum will be reserved for later proceedings.

I.

As stated above, there is little dispute regarding the facts. The following is a narrative of the relevant facts as found by the court giving due regard to the proprietary nature of some of the material involved.

The plaintiff, Research, Analysis & Development, Inc. (RAD) is a small company which engages primarily in research and development work in the aerospace field. It employs predominantly aerospace scientists and engineers.[1] In June of 1975, plaintiff initiated the study of a highly technical aviation concept in aircraft sensor systems. As a result of its research on this concept, on September 27, 1976, plaintiff submitted an unsolicited proposal to the Air Force Flight Dynamics Laboratory (AFFDL) encompassing this sensor concept as well as other material.

When plaintiff submitted its unsolicited proposal on September 27, 1976, it included on the title page the following "Proprietary Statement":

> This data shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed in whole or in part for any purpose other than to evaluate the proposal; provided, that if a contract is awarded to this offeror as a result of or in connection with the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the contract. This restriction does not limit the Government's right to use information contained in the data if obtained from another source without restriction. The data subject to this restriction is contained on the pages so marked.

The language in this "Proprietary Statement" was the suggested language for such a restrictive legend found in 32 CFR § 3-507.1(a) (1976). Section 3-507.1(a) states in pertinent part:

> (a) A proposal, *whether solicited or unsolicited,* may include data such as a technical design or concept or financial or management plan, which the offeror does not want disclosed to the public for any purpose or used by the Government for any purpose other than evaluation of the proposal. If an offeror wishes so to

restrict his proposal, he shall mark the title page with the [above cited] legend.

> \* \* \* \* \* \*

> Contracting officers and other Government personnel shall not refuse to consider any proposal merely because it or the data submitted with it is so marked. Those portions of the proposal and data which are so marked (except for information which is also obtained from another source without restriction) *shall be used only to evaluate the proposal and shall not be disclosed outside the Government without the written permission of the offeror.* [Emphasis added.]

It is clear in this case that plaintiff complied with the applicable regulation and defendant was obligated to do the same.

As stated earlier, plaintiff's proposal was unsolicited. It was a policy of the government to encourage the submission of such unsolicited proposals. *See* 32 CFR § 4-107 (1976). In order to encourage such proposals 32 CFR § 4-107 recognizes the propietary nature of the submissions. Section 4-107(a) states:

> (a) Unsolicited proposals may be the product of original thinking and generally are the property of the organization or individual who presents them. They are offered in the hope that the Government will contract with the offeror for further research on, or development of, the ideas they contain. Accordingly, it is important that such proposals received by purchasing activities be handled in a manner which will encourage prospective contractors to disclose to the Government ideas which they have originated, conceived or developed.

Section 4-107(b) specifically refers to the proposer's ability to utilize the restrictive legend set out in section 3-507.1(a), cited above, and states that the legend will be complied with by the government.

After presumably evaluating plaintiff's proposal during the latter part of 1976 and

---

1. RAD's president and founder, Richard E. Willes, has extensive educational credentials and experience in aerospace technology which indicates to the court the nature and extent of the research performed by RAD.

early part of 1977, the Air Force sent plaintiff a letter, dated February 1, 1977, regarding its proposal. The letter continually referred to plaintiff's sensor "concept" and acknowleged its novelty. The letter noted the potential technological advancement offered by plaintiff's sensor system. In the third and final paragraph of the letter, the Air Force stated:

We appreciate the effort you have expended in keeping the USAF informed of your *novel concepts.* RAD will certainly be considered when future procurements related to novel sensor development and use are contemplated. *The information you have provided in the subject proposal will be appropriately safeguarded. No disclosure of the information will be made nor will any part of the proposal be reproduced without explicit permission from RAD Inc.* [Emphasis added.]

The record indicates that the sensor system proposed by plaintiff was novel and a potentially vast improvement over the systems then incorporated into state of the art aircraft. The proposed system offered greater simplicity, accuracy and cost and weight savings compared with the systems being utilized at that time. The Air Force in its February 1, 1977, letter, cited above, acknowledged the novelty of the proposed concept and the "far-reaching consequences" if it was successfully demonstrated. This February 1, 1977, letter clearly indicated that the Air Force perceived plaintiff's proposed sensor concept as a step beyond the then current technology.

On February 11, 1977, after studying plaintiff's proposal, the AFFDL, prepared a Purchase Request (No. FY14567700483) asking the contracting officer to enter into a sole source contract with plaintiff to study the feasibility of its sensor concept. Included with the Purchase Request was a Sole Source Justification. In the Sole Source Justification document the AFFDL referred to plaintiff's sensor "concept" as "unique and promising." It also called the sensor concept a "revolutionary approach." The document indicated that plaintiff's pro-

posal outstripped current technology. The Description/Specifications document (Statement of Work) enclosed with the Purchase Request also acknowledged the uniqueness of plaintiff's proposed concept.

Despite defendant's February 1, 1977, assurance that it would not disclose any information in plaintiff's proposal without plaintiff's permission, and notwithstanding its regulatory obligation to safeguard plaintiff's proposed concept, the Air Force published a May 10, 1977, release in the *Commerce Business Daily (CBD)* requesting responses regarding the feasibility of a sensor system concept identical to that proposed by plaintiff. The release identified the concept by the same name as that used by plaintiff. The language used in the release was essentially taken from the Statement of Work document enclosed with the AFFDL's February 11, 1977, Purchase Request.

Shortly after learning of the *CBD* release plaintiff sent a telegram to the Air Force objecting to the disclosure of this information. This May 14, 1977, telegram stated in pertinent part:

We have discovered that the most sensitive portion of our proprietary unsolicited proposal No. 76–12, * * * was published in the Commerce Business Daily (CBD), R & D Sources Sought, on 10 May 77, (received by RAD this date) without RAD's written permission, in violation of the ASPRs [32 CFR §§ 3–507.1 and 4–107 (1976)].

RAD must inform you that we considered all data contained in the subject proposal to be proprietary. But certainly the disclosure of the exceedingly sensitive * * * [sensor] concept is extremely damaging to RAD, * * *. * * * RAD has integrated this technology at sizeable private expense. * * * The mere suggestion that such precision measurements and identifications are possible is extremely perishable proprietary information and has been specifically projected as such with appropriate legends.

\* \* \* \* \* \*

This proprietary declaration and position was specifically acknowledged * * * by AFFDL.FG letter of 1 Feb. 77.

Plaintiff then demanded in its telegram that defendant: (1) cease further unauthorized dissemination of plaintiff's proprietary information, (2) appropriately safeguard this information, (3) not issue a procurement to any other firms predicated on plaintiff's proprietary data, and (4) provide adequate restitution to plaintiff for damages caused by defendant's actions.

Apparently, after receiving and considering plaintiff's telegram, defendant realized that it may have erroneously released proprietary data supplied by plaintiff. It subsequently limited discussions with business concerns which responded to its *CBD* release and eventually postponed the procurement proposed in the release. The Air Force later considered awarding the sole source contract to study the feasibility of plaintiff's sensor concept to plaintiff, but it cancelled the "RFP" on September 1, 1977 due to reorganization of the AFFDL mission responsibilities which precluded the continuance of the procurement action. Plaintiff waited until April 8, 1983, to file its complaint in this court, requesting damages related to defendant's alleged breach of an implied-in-fact contract not to disclose plaintiff's proprietary information.

## II.

■ The first issue the court must address is whether an implied-in-fact contract between plaintiff and defendant existed which would give the court jurisdiction over plaintiff's claim. Defendant argues that at most an implied-in-law contract existed between the parties based on the pertinent regulations. This court has no jurisdiction to grant recovery to a plaintiff based on such an implied-in-law contract. *Putman Mills Corp. v. United States*, 202 Ct.Cl. 1, 8 n. 3, 479 F.2d 1334, 1337 n. 3 (1973); *Pacific Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 340 (1983) *aff'd without opinion*, 738 F.2d 452 (Fed.Cir.1984). *See also United States v. Minnesota Mu-*

*tual Investment Co.*, 271 U.S. 212, 217, 46 S.Ct. 501, 502, 70 L.Ed. 911 (1926).

■ Plaintiff, on the other hand, asserts that the pertinent regulations and defendant's February 1, 1977, letter to plaintiff agreeing not to disclose plaintiff's proprietary data without plaintiff's permission created an implied-in-fact contractual obligation on the part of defendant to safeguard the proprietary data. After considering the undisputed facts in this case, the court concludes that an implied-in-fact contract did exist obligating defendant to maintain the confidentiality of plaintiff's proprietary data in its proposal. *See Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1359–61 (1983) and cases cited therein.

In a factual situation almost identical to that present in this case, the Claims Court found that such an implied-in-fact contractual obligation existed in *Airborne Data, Inc. v. United States*. *See* 30 Cont.Cas. Fed. (CCH) ¶ 70,108 (1982). The Federal Circuit affirmed this finding. *Id.* 702 F.2d at 1352–53. If anything, the facts of this case are more favorable to a finding of an implied-in-fact contract not to disclose the proprietary information. In *Airborne Data, Inc.* the court focused on the existence of the applicable regulation (41 CFR §§ 14–4.501–2(c), 3(a) (1977)) which required the government to respect the plaintiff's proprietary legend on an unsolicited proposal. Such a regulation was similar to those involved in this case. The court found that the plaintiff's actions in submitting a proposal with the proper restrictive legend and the defendant's efforts to fulfill its obligation to safeguard the contents of the proposal constituted a "meeting of the minds" which created an implied-in-fact contract. *Id.* 702 F.2d at 1359–60. In this case, the same regulatory parameters existed and the parties acted in a similar manner. In addition, defendant's February 1, 1977, letter *agreeing* to safeguard plaintiff's proprietary data provides further support for finding an implied-in-fact contract, which the court in *Airborne Data* did not have to buttress its conclusion that such a contract existed. The actions of the par-

ties, specifically defendant's February 1, 1977, letter demonstrates a mutual intent to contract to safeguard plaintiff's proprietary data. *See Id.* 702 F.2d at 1360. *See also Pacific Gas & Elec. Co. v. United States, supra,* 3 Cl.Ct. at 338–39; *Prevado Village Partnership v. United States,* 3 Cl.Ct. 219, 223–24 (1983); *Wertz v. United States,* 2 Cl.Ct. 45, 51–52 (1983). Therefore, the court concludes that an implied-in-fact contract was present between defendant and plaintiff, which in part, obligated defendant not to disclose any proprietary data in plaintiff's proposal without first acquiring plaintiff's express permission.

Having found an implied-in-fact contract present, the second issue the court must address is whether the disclosure of the information in the *CBD* release constituted a violation of that contract. Defendant argues that its disclosure in the *CBD* release was not a violation of the contract because the information included in the publication concerned portions of plaintiff's proposal which could not properly be considered "trade secrets." If the information did not constitute a trade secret then it was not proprietary and exposing it did not violate the contract. *Frodge v. United States,* 204 Ct.Cl. 812 (1974). The court concurs with this theory but does not find it controlling in this case.

Defendant analyzed the *CBD* release by breaking it down into its components, *i.e.,* title and three sentences. The release utilized the same name for the proposed concept as that chosen by plaintiff. Defendant, however, contends that the name given to the proposed system was generic. However, defendant cited no previous studies or proposals which used such a title. In defendant's sentence-by-sentence analysis, it asserted that the information disclosed in

each sentence did not expose any technology which was not known to the government and the trade in general. The court, however, is persuaded that defendant's analysis is flawed.

First, it is clear that plaintiff's unsolicited proposal dealt with a sensor system *concept.* Defendant admits this in its brief (Dft's Br. 9) and the Air Force documents submitted to the court identify the proposed system as a concept. The court finds that a reasonable reading of the *CBD* release as a whole, as opposed to reading it sentence-by-sentence, basically describes plaintiff's proposed concept. Reading the release in a piecemeal fashion as defendant proposes does not convey the full message of the *CBD* publication. However, construing the entire release, it is reasonable to read the release as describing a sensor concept which alone has the capability of analyzing a variety of data and producing technical feedback concerning several different phenomena which were previously measured by different devices. The *CBD* release also identified the physical principle which the proposed sensor system relied upon in order to make the necessary measurements. Finally, the *CBD* publication identified the need to develop a means of isolating the measurements of the different inputs made by the unified sensor concept so that the requisite measurement outputs could be derived. It implied that such a concept could produce the precise technical data measurements required for advanced aircraft. The court is convinced that the *CBD* release can reasonably be read as disclosing sufficient data about plaintiff's proposed concept to indicate to a great extent exactly what plaintiff's concept entailed.[2] Therefore, reading the *CBD* release in its entirety, if

---

**2.** The court agrees with the statement made by plaintiff's president, Richard E. Willes, in his affidavit that the *CBD* release gave sufficient information "to give anyone knowledgeable in the field an understanding of * * * [plaintiff's sensor] concept." The court believes that it is plaintiff's competitors, *i.e.,* those "knowledgeable in the field" who are relevant in determining whether the *CBD* release taken as a whole exposed any proprietary data. The court notes

that the fact that plaintiff's competitors may have eventually developed a similar concept on their own does not preclude a finding that defendant breached its contractual obligation and that plaintiff is entitled to damages therefrom. *See Telex Corp. v. International Business Machines Corp.,* 510 F.2d 894, 929, 931 (10th Cir. 1975), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 224.

plaintiff's concept as a whole was novel, original and not known in the trade or to the government then defendant did violate its contractual obligation not to disclose plaintiff's proprietary information.

Defendant contends that plaintiff's proposed sensor concept was neither a "trade secret" nor novel. Defendant cites several sources predating plaintiff's proposal which it claims identify technology similar to that proposed by plaintiff. Defendant argues that these other previous studies clearly demonstrate that plaintiff's concept was not unique or novel. The court is persuaded that the facts in this case demonstrate otherwise.

Plaintiff initially submitted its proposal on September 27, 1976. After having the opportunity to analyze this proposal for over 4 months the Air Force sent plaintiff the February 1, 1977, letter. This letter expressly acknowledged that plaintiff's sensor *"concept is certainly novel * * *."* (Emphasis added.) In fact, the Air Force regarded plaintiff's proposal to be of such a novel nature that it agreed to safeguard the information contained therein. Other Air Force documents, including the Sole Source Justification and Statement of Work documents, referred to plaintiff's *concept* as "unique," and "a revolutionary approach." At no time prior to plaintiff's May 14, 1977, telegram to the Air Force protesting the disclosure of plaintiff's proprietary data in the *CBD* release, did the Air Force indicate that plaintiff's proposal was not unique or novel. The Air Force documentation, to the contrary, clearly indicated that it felt that plaintiff's proposal was unique and worthy of further study. It was not until after plaintiff protested the disclosure of the information that defendant attempted to find other studies which developed concepts similar to plaintiff's. "That evidence [defendant's prior acknowledgments of the novelty and uniqueness of plaintiff's concept] is far more persuasive here than governmental denigration of the novelty and worth of the technology following germination of the seeds of this lawsuit. *Cf Canadian Commercial Corp. v. United States,* 202 Ct.Cl. 65, 79 (1973)."

*Airborne Data, Inc. v. United States, supra,* 702 F.2d at 1357. It is based on the acknowledgments of the Air Force regarding the novelty of plaintiff's proposed sensor concept that the court finds that the information disclosed in the *CBD* release was proprietary and thus defendant breached its implied-in-fact contractual obligation.

In addition, the court notes that a comparison of plaintiff's sensor concept with the studies, cited by defendant, which it asserts demonstrate the fact that plaintiff's proposal was not a "trade secret," involves highly complex, technical matters. Having reviewed the various studies cited by defendant along with plaintiff's proposal and the affidavits of plaintiff's president and founder, Richard E. Willes (Willes) and Air Force Supervising Aerospace Engineer, Thomas J. Weeks, Sr. (Weeks), the court is further persuaded that plaintiff's proposal was indeed unique and revolutionary. Willes pointed out that the prior technology, cited by defendant, involved systems which required the use of more than one type of sensor system to acquire a variety of data. Plaintiff's concept, on the other hand, used a unified system utilizing a single process which calculated and singled out various measurements encompassing all the sensor needs of advanced aircraft. Previous sensor systems which utilized the same physical principles as plaintiff's system to develop its measurements were only capable of performing a single measurement. The court finds that Willes' affidavit clearly sets out that plaintiff's proposed system was indeed novel and that the *CBD* release exposed some of the vital proprietary data associated with its proposal.

Weeks, on the other hand, utilized the sentence-by-sentence analysis of the *CBD* release to show that the release did not expose any of the proprietary data in plaintiff's proposal. The court has previously rejected such an analysis of the *CBD* publication in favor of reading it as a whole. After plaintiff protested the disclosure of the asserted proprietary data, Weeks also attempted to demonstrate that plaintiff's

proposed sensor concept was, in fact, not novel. The court finds such an after-the-fact attempt to question the novelty of plaintiff's proposal subsequent to the Air Force recognition of such novelty to be suspect and unpersuasive. *See Airborne Data, Inc. v. United States, supra,* 702 F.2d at 1357.

One final point deserves mention here. The *Airborne Data* holding, discussed above, is critical to the court's decision herein. Defendant has made no effort to counter the holding of that case and its application to the facts in this case, nor has defendant made any effort to distinguish this case from the *Airborne Data* case. Instead, defendant merely " * * * concedes that this court is bound by the holding in *Airborne Data,* but wishes to preserve the issue should an appeal be taken by either party." (Def't's Br. p. 13.)

 Therefore, based on the parties' briefs and submitted affidavits and documentation, the court is persuaded that (1) plaintiff has established that an implied-in-fact contract existed obligating defendant to safeguard any proprietary data in plaintiff's proposal, (2) the *CBD* release contained sufficient information regarding plaintiff's sensor concept to give its competitors knowledge of the concept, and (3) plaintiff's concept was novel and unique, and therefore, defendant's actions in exposing information regarding plaintiff's system in the *CBD* constituted a breach of defendant's implied-in-fact contractual obligation.[3]

### III.

Based on the above discussion, the court grants plaintiff's motion for summary judgment on the issue of liability and denies defendant's cross-motion for summary judgment on the same issue. The parties are directed to advise the court within 30 days of the date of this opinion whether the quantum issue will be subject to disposition by settlement or by trial.[4]

3. In its answer defendant also raised failure of consideration and laches as defenses. Both of these defenses are classified as affirmative defenses. RUSCC 8(c) (1984). In its cross-motion for summary judgment, defendant failed to address both of these defenses and thus is "deemed to have abandoned [them]." *Nossen v. United States,* 189 Ct.Cl. 1, 18, 416 F.2d 1362, 1371 (1969), *cert. denied,* 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970) (as cited in *Smuck v. United States,* 5 Cl.Ct. 94, 96 n. 3 (1984)). In any event, the court notes that laches generally is not applicable as a defense in contract cases. *See Fraass Surgical Mfg. Co. v. United States,* 205 Ct.Cl. 585, 592, 505 F.2d 707, 710 (1974). The court also views the defense of failure of consideration to be inapplicable given the facts in this case surrounding the implied-in-fact contract. *See generally Airborne Data, Inc. v. United States,* 702 F.2d 1350 (Fed.Cir.1983).

4. The court recognizes the potential complexity and speculative nature of any damage determination given the facts in this case. Each side should not seek to take advantage of such an uncertain quantum milieu in the hope of getting everything or giving nothing. Justice demands a fair, honest and reasonably prompt approach in cases such as this.